J-A29022-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.L.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.D., FATHER | : | No. 690 WDA 2024 |

Appeal from the Order Entered May 11, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000167-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: C.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.D., FATHER | : | No. 691 WDA 2024 |

Appeal from the Order Entered May 11, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000170-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: D.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.D., FATHER | : | No. 692 WDA 2024 |

Appeal from the Order Entered May 11, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000168-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: D.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.D., FATHER | : | No. 693 WDA 2024 |

Appeal from the Order Entered May 11, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000169-2022

J-A29022-24

BEFORE:  OLSON, J., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY LANE, J.:  **FILED: MARCH 27, 2025**

D.D. ("Father") appeals from the orders imposed terminating his parental rights to his children: D.L.D., born in August 2013; D.D. ("Drl.D.") born in August 2016; D.D. ("Drv.D.") born in March 2019,[1] and C.D., born in December 2020 (collectively, "the Children").[2]  After careful review, we conclude the Allegheny County Children, Youth, and Families Services agency ("CYF") did not present sufficient evidence for termination under subsection 2511(b) of the Pennsylvania Adoption Act.[3]  Thus, we vacate and remand.

Father and Mother (collectively, "the Parents") have six biological children: the four subject Children of these appeals, as well as Dn.D., born in 2012 (the oldest child) and Di.D., born in 2015 (the third child).  CYF has been involved with this family for twelve years, since 2012 when it received and

---

[1] As two of the Children have the same initials, we clarify that Drl.D.'s matter is docketed in the trial at CP-02-AP-0000168-2022 and in the Superior Court at 692 EDA 2024.  Drv.D.'s matter is at trial docket CP-02-AP-0000169-2022 and Superior Court docket 693 EDA 2024.

[2] The trial court also terminated the parental rights of the Children's mother, S.P. ("Mother").  She consented to termination as to the three older Children, but appeals from the termination as to C.D.  This panel affirms that termination order at Superior Court docket 685 WDA 2024.

[3] **See** 23 Pa.C.S.A. § 2511(b).

- 2 -

found valid a general protective services ("GPS") report of domestic violence.[4]
Throughout this case, Father's court-ordered goals were generally to participate in drug and alcohol treatment, mental health treatment, and a batterer's intervention program, and to have visits with the Children.

The trial court has summarized the extensive procedural history of this matter. *See* Trial Court Opinion, 9/5/24, at 4-14. As we write for the parties and the trial court, who are familiar with this record, and we dispose of this appeal under subsection 2511(b), we need not engage in a detailed review of the entire case. Instead, we review the evidence relevant to our consideration of subsection 2511(b).

CYF initiated dependency proceedings for the Parents' second child, D.L.D., the same year she was born, 2013. By August 2014, Father was incarcerated.[5] Drl.D. was born in 2016.[6]

_____

[4] At that time, Father and Mother had one child, Dn.D. At some point, she was adjudicated dependent, was placed in the care of Mother's mother ("Maternal Grandmother"), "never returned to either parent," and was adopted by Maternal Grandmother in 2015. Trial Court Opinion, 9/5/24, at 5.

[5] Parents' third child, Di.D. — who is not a part of the instant appeals — was born in 2015. At some time, he was also adjudicated dependent and placed with a foster parent — whom Mother identified at the termination hearing as her father. *See* N.T., 5/3/24, at 102. At the time of the instant termination orders, Di.D.'s permanency goal remained reunification.

[6] Around 2018, D.L.D. disclosed "inappropriate touching by Father. [D.L.D., Drl.D., and Di.D] were removed for a brief period, but . . . returned to Mother's care by the time of the adjudicatory hearing in 2019." Trial Court Opinion, 9/5/24, at 6 (footnotes omitted). However, at the underlying termination
*(Footnote Continued Next Page)*

Following Father's release from prison, the Parents resumed their relationship, and the IPV continued. Mother "obtained a Protection from Abuse Order ('PFA') against Father in December 2018. "[H]e had already violated it twice by" March 2019, when the trial court adjudicated dependent D.L.D., then five years old, and Drl.D., then two years old. Drv.D. was born that same month. Eight months later, in December 2019, the trial court adjudicated Drv.D. dependent. "By the time of the August 2020 review hearing, . . . IPV remained an ongoing issue. Father was again incarcerated due to a violation of the PFA and had been arrested for a separate violation in May." Trial Court Opinion, 9/5/24, at 8.

In September 2020, CYF obtained emergency custody to remove the Children from Mother's care. D.L.D., Drl.D., and Drv.D. were placed with Maternal Grandmother, and have remained in her care since then.

C.D., the youngest child, was born in December 2020. The trial court adjudicated him dependent in August 2021, when he was eight months old, and CYF placed him with his current foster parents.

> IPV between Father and Mother had resurfaced[.] Mother testified that she wished to terminate the PFA order[,] reconcile with Father[,] and reside together as a family. [T]he court had concerns regarding Mother's ability to maintain her safety in Father's presence, and a significant risk that C.D. could be exposed to further violence between Parents.

---

hearings, there was no explanation as to any investigation or ultimate finding of this disclosure. *See* N.T., 4/19/24, at 120.

Trial Court Opinion, 9/5/24, at 9-10 (footnotes and unnecessary capitalization omitted).

> The trial court further summarized:
>
> By the next review hearing in November 2021, Father was again incarcerated as a result of new criminal charges for assaulting Mother. Over the next year, Father continued to be in and out of jail and failed to maintain consistent contact with CYF. IPV between Parents remained a concern and Mother was granted a second PFA against Father in April 2022. . . .

Trial Court Opinion, 9/5/24, at 9-11 (footnotes omitted).

On November 14, 2022, CYF filed the underlying petitions to terminate both Parents' parental rights as to: D.L.D., then nine years old; Drl.D., six years old; Drv.D., three years old; and C.D., almost two years old. At that time, the older children had been removed from Mother's care for more than two years, and C.D. had been removed for fourteen months. "By January of 2023, Father was incarcerated again and facing numerous criminal charges." *Id*. at 11 (footnote omitted).

The trial court conducted hearings on the termination petitions on April 19 and May 3, 2024.[7] CYF presented testimony that Father was released from prison in November 2023 and was required to comply with Justice Related Services ("JRS"), a program providing drug and alcohol treatment, mental health treatment, and short-term housing. **See** N.T., 4/19/24, at 12-13. As

---

[7] At the time of the second hearing, Mother was incarcerated on drug and firearms charges, and she withdrew her challenge to the termination of her rights as to the three older children.

a part of this program, Father entered the Renewal Center, successfully completed it in January 2024, and then entered Skyline Recovery House, "a three-quarter house." *Id*. at 13; *see also id*. at 135. However, Father was also required to "enter dual diagnosis treatment at Pyramid," but failed to attend two intake appointments. As a result, Father "was unsuccessfully discharged from the JRS program." *Id*. at 13. Later that month, Father was "kicked out" of Skyline Recovery House for violating its rules. Consequently, Father was arrested in early March 2024 for a probation violation, and remained incarcerated at the time of the April and May 2024 termination hearings. *Id*. at 14.

Stacy-Ann Wilson-Williams ("CYF Caseworker"), the assigned CYF caseworker since 2018, testified to the following. Father had not completed drug and alcohol or mental health treatment. He completed a batterer's intervention program while in prison, but even after completion of it, he had additional domestic violence incidents, which led to both PFA violations and criminal charges. *See id*. at 128-29. The final PFA order, issued in 2022, remained active, but Father had most recently violated it in November 2022.

With regard to visitation with the Children, CYF Caseworker testified to the following. Father had bi-weekly virtual visits at the Allegheny County Jail, from July to November 2023.[8] *See* N.T., 4/19/24, at 132, 137. D.L.D. and

_____

[8] We note these visits post-dated the November 2022 filing of the termination petitions.

Drl.D. participated, but Drv.D. "frequently [said] that she does[ not] want to have the visits," and at times "did[ not] want to face the camera." *Id*. at 138-39. CYF Caseworker observed one visit and testified that "it went well," and Father "was appropriate." *Id*. at 143.

As stated above, Father was released from the county jail in November 2023. One week thereafter, the trial court issued an order directing that: Father have weekly video visits with D.L.D., Drl.D., and Drv.D., to be "facilitated by" Maternal Grandmother; and possible in-person visits at the Renewal Center. N.T., 4/18/24, at 134-35. CYF Caseworker contacted the Renewal Center, but did not receive a response; however, the caseworker acknowledged that Renewal "usual[ly]" would not respond or provide information. *Id*. at 135-36. Meanwhile, CYF "lost contact" with Father. *Id*. at 136. CYF "implemented the Corporate Security Investigation to try to locate" him and contacted the probation department, who responded that he was at the Skyline Recovery House. *Id*. at 137. Caseworker Wilson-Williams then visited the Skyline Recovery House, but learned Father was no longer there. Father was incarcerated again in March 2024. *See id*. at 132.

CYF Caseworker opined Father "had enough time to remedy the conditions that brought the [C]hildren into care," but he was not currently in a position to care for the Children, had "not made any progress with his court-recommended goals," continued to "exhibit" "violent" behavior, and was incarcerated multiple times throughout this dependency matter. *Id*. at 133-

34. CYF Caseworker also stated there were no other services that CYF could offer Father. *See id*. at 133. We note the caseworker did not give any testimony as to whether there was a bond between Father and the Children, nor as to the effect termination would have on the Children.

CYF also presented psychologist Terry O'Hara, Psy.D. ("Dr. O'Hara"), as an expert in forensic psychology. He testified to the following. In 2023, Dr. O'Hara evaluated Father, who was then incarcerated, by video. Dr. O'Hara acknowledged there were "some limitations in conducting an evaluation in that format," and it is "qualitatively different to see someone face to face as opposed to virtually." N.T., 4/19/24, at 48, 92. Dr. O'Hara further explained he was not "able to administer the full psychological battery because [Father] was incarcerated," Dr. O'Hara could not "speak with any collateral sources," and Father could not "sign any releases . . . due to incarceration." *Id*. at 50.

Nevertheless, Dr. O'Hara summarized his evaluation as follows. Dr. O'Hara diagnosed Father with unspecified depressive disorder; he did not "rule[] out opioid abuse," but noted "it needs to be ruled out." *Id*. at 150. Father "reported the Strattera [*sic*] to be helpful, [and] that was a positive. On the other hand, [Father] had a pretty extensive history of criminal activity," which included aggravated assault, simple assault, recklessly endangering another person, terroristic threats, harassment, retail theft, and trespass. *Id*. at 49. However, Father denied he had any prior convictions. *See id*. at 50.

Dr. O'Hara testified:

[Father did not] assume any responsibility for his circumstances. He reported a history of depression and anxiety which was long-standing. He reported some auditory hallucination which had occurred . . . "months ago[."] He reported psychiatric hospitalization the prior year due to depression, significant history of cannabis usage, benzodiazepine usage. He was using apparently two to four boxes of cough and cold medicine per day at that time[.]

[Father] acknowledged IPV in the relationship with [Mother]. According to [Father], the [C]hildren were exposed to argumentation, and domestic violence, . . . "used to be all the time," [*sic*] including . . . physical violence and control. He reported the relationship with [Mother] to be toxic.

N.T., 4/19/24, at 49.

Dr. O'Hara conducted "interactional evaluation[s]" of D.L.D., Drl.D., and Drv.D. with Mother, as well as of those Children with Maternal Grandmother. *Id*. at 47, 52. Dr. O'Hara was "not sure" whether all the Children were aware that Father was incarcerated. *Id*. at 73. D.L.D. stated she last saw Father in 2021, and that "when he was in jail he looked different." *Id*. Drl.D. "stated she has not had visits with [F]ather and last saw [him] 'only in court.'" *Id*. Dr. O'Hara asked Drl.D. about her relationship with Father, and she replied, "[Z]ero percent. We don't even see him." *Id*. at 73, 98. Additionally, Dr. O'Hara completed an "interactional" evaluation of C.D. and his foster parents, and found the latter "were appropriate." *Id*. at 51. Dr. O'Hara opined that both foster homes would be appropriate long-term resources for the Children. *Id*. at 74.

Dr. O'Hara generally noted that it is "difficult for children to establish a meaningful relationship and secure attachment with a caregiver in the absence

of consistent and quality contact." N.T., 4/19/24, at 55. However, Dr. O'Hara did not observe Father interact with the Children, and was not aware of how many visits he was to have under court order. *See id*. at 54, 92, 94. Dr. O'Hara was aware that CYF "report[ed] that Father interact[ed] well with the [C]hildren who attend[ed] virtual visits." *Id*. at 98. However, Dr. O'Hara opined:

> I'm not able to say anything about [Father's] parenting. . . . I can say what the [C]hildren stated to me about [their] relationship with [F]ather, and I can speak hypothetically about the experience for children when they lack consistent meaningful contact with a caregiver.
>
> . . . I'm not able to speak about detriment . . . in a meaningful way without . . . having any observation of the [C]hildren with [F]ather.

*Id*. at 93; *see also id*. at 89 (Dr. O'Hara testifying, "I'm obviously not able to comment upon detriment in relation to [Father] as I did[ not] observe him with the [C]hildren at any time").

Nevertheless, Dr. O'Hara concluded he had "concerns" about Father's potential unsupervised contact with the Children. N.T., 4/19/24, at 54. Dr. O'Hara opined that he "did not have evidence" that Father was "compliant with treatment or making progress," was "in any position to care for a child's needs and welfare at the time of [his] evaluation[,]" or "would be able to make progress in a reasonable amount of time." *Id*. at 54-55, 74. Dr. O'Hara reiterated that Father "lacked assumption of responsibility." *Id*. at 55.

Father testified to the following. He had virtual visits with the Children at the county jail from July through November 2023. The visits went "great," and they talked about school, activities, the Children's friends, and when Father would return home. N.T., 4/19/24, at 154. Drl.D. did not "really like the video visits" and "was a little distant." *Id*. D.L.D. had "great visits" with Father; she was "very bright," told Father "a lot of stuff about her friends and . . . school," and "she really wants [Father] to be in her life a lot." *Id*. at 155. Drv.D., who is younger, said Father's "name over and over again," and Father played peekaboo with him. *Id*. Father similarly played with C.D.

Father acknowledged that he did not participate in drug and alcohol treatment or parenting classes. When asked why not, he responded, "I don't know. I wasn't really into it. I end[ed] up going to the Renewal Center to do my drug and alcohol, so I finished drug and alcohol." *Id*. at 156-57. Father testified that he also "completed" mental health treatment at the Renewal Center, describing the treatment as "some lady . . . would just come see me and ask me a bunch of questions." *Id*. at 157. When asked why he left the Skyline Recovery House, Father replied, "I had a recent loss in my family, and . . . I ended up doing cannabis, and they [kicked] me out for that." *Id*. at 157-58

Father opposed termination of his parental rights, stating: "I love my children, and I need to be in my children's [lives]. My children need me, and I need them." *Id*. at 159. When asked on cross-examination when he last

"provided significant support for any of" the Children, Father replied that he gave them "some food stamps" earlier that year. *Id*. at 160.

At the conclusion of the second hearing, the trial court entered the underlying orders terminating Father's parental rights to all four Children, under subsections 2511(a)(2) and (b). Father filed timely notices of appeal at each child's docket, along with Pa.R.A.P. 1925(a)(2) concise statements of errors complained of on appeal.

Father raises the following issues for our review:

1. Whether the trial court abused its discretion and/or erred as a matter of law by finding that CYF met its burden of proof by clear and convincing evidence thereby granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2)?

2. Whether the trial court abused its discretion and/or erred as a matter of law in finding that CYF met its burden of proof by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of the minor children pursuant to 23 Pa.C.S. § 2511(b)?

Father's Brief at 13.

We review Father's second issue first, as it is dispositive of this appeal. Father asserts the trial court erred in finding sufficient evidence that termination would best meet the Children's needs and welfare under subsection 2511(b). We consider the applicable standard of review:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. [We] accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but [we are not] require[d] to accept the [trial] court's

inferences or conclusions of law. . . . "We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings." However, "[w]e must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence."

***In re Adoption of C.M.***, 255 A.3d 343, 358-59 (Pa. 2021) (citations omitted).

The Pennsylvania Supreme Court has acknowledged

the significant gravity of a termination of parental rights, which has far-reaching and intentionally irreversible consequences for the parents and the child. . . . Because of this serious impact attending the termination of parental rights, "'it is important that a judicial decree extinguishing such rights be based solely on competent evidence.'"

***Id***. at 358 (citations omitted).

This Court has explained:

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [section] 2511(a).

Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [section] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***Interest of K.T.***, 324 A.3d 49, 56 (Pa. Super. 2024) (citations and unnecessary capitalization omitted and paragraph break added).

> Subsection 2511(b) states:
>
> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  . . .

23 Pa.C.S.A. § 2511(b).

> Under subsection 2511(b), "'the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.'  The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well." ***In re M.P.***, 204 A.3d 976, 983 (Pa. Super. 2019) (citations omitted).

> Section 2511(b) . . . focuses not on the parent's conduct, but on the children and their needs.  The court must consider the needs and welfare of the children, including the presence of any parent-child emotional bond, which encompasses intangibles such as love, comfort, security, and stability.  When an emotional bond is present between parent and child, the court must consider the effect of its permanent severance on the child.  . . .

***In re Adoption of R.J.S.***, 901 A.2d 502, 508 (Pa. Super. 2006) (citations omitted).

This Court has "reversed and remanded termination cases in which the child welfare agency failed to present sufficient evidence concerning the presence or absence of a parent-child bond and the likely effect of its

permanent cleavage on the child." ***In re S.D.T.***, 934 A.2d 703, 706 (Pa. Super. 2007) (*citing **In re Adoption of R.J.S.***, 901 A.2d at 508). ***See also Interest of J.R.R.***, 229 A.3d 8, 13 (Pa. Super. 2020) (vacating termination order where it was "undisputed in the certified record" that a bond existed between the father and fourteen-year old child and this relationship was beneficial to the child); ***In re Adoption of R.J.S.***, 901 A.2d at 514 (vacating termination order where "the parties presented almost no evidence directly relevant to the issue of emotional bonds, if any, between [the m]other and her sons" and "[t]he possibility of a parent-child bond [was] indirectly suggested by" the agency's witnesses' testimony).

Finally, we note, with respect to an incarcerated parent:

> [I]ncarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing essential parental care, control, or subsistence. Incarceration alone is not sufficient to support termination under any subsection, but incarceration will certainly impact a parent's capability of performing parental duties[.]

***Interest of K.M.W.***, 238 A.3d 465, 474 (Pa. Super. 2020) (*en banc*) (citations and quotation marks omitted).

On appeal, Father asserts the trial court erred in finding sufficient evidence, under subsection 2511(b), that termination would best meet the Children's needs and welfare. Father maintains "Dr. O'Hara was not able to opine or testify as to any direct knowledge or evaluation of Father's relationship or bond with his children." Father's Brief at 43. Instead, Father contends, the evidence showed he "interacted well with the [C]hildren at

visits, [and] engaged in age-appropriate conversations and/or play," and

D.L.D. and Drv.D. refer to him as "Dad" and "Daddy." *Id*. at 44.

In its opinion, the trial court considered the history of the visits between

Father and the Children:

> Regarding visitation with the Children over the life of the case, Father failed to take advantage of the opportunity to do so while not incarcerated. In August of 2022, the Court found that aggravated circumstances existed as Father's last in-person visit with Children was in September of 2021, and his last video call was in December 2021. Other than the visit in September of 2021, CYF's only documented visitation consisted of video-visits while incarcerated.

Trial Court Opinion, 9/5/24, at 12 (footnotes omitted). The trial court also

considered Dr. O'Hara's testimony "it is very difficult for children to develop

meaningful relationships with parties if there is a lack of visitation." *Id*. at 14.

The trial court noted it had "found Father was not visiting with the

Children." *Id*. at 24. The court thus found: "[T]he Children simply have not

had the level of contact with Father that would have enabled them to develop

a secure attachment. To this point, Dr. O'Hara testified that children need to

be in a 'safe, secure, stable environment . . . with a caregiver who is

responsive and nurturing.'" *Id*. The court thus concluded: "[T]he evidence

in this matter supports [a] conclusion that the Children lack any form of a

meaningful relationship, and therefore any bond with Father, and that they

will not suffer extreme emotional consequences from termination of Father's

parental rights." *Id*. at 23.

- 16 -

After careful review of the record, we determine the evidence of record does not support the termination of Father's parental rights. *See In re Adoption of C.M.*, 255 A.3d at 358. In stating Father's "last video call [with the Children] was in December 2021," the trial court cited a prior order dated August 31, 2022. Trial Court Opinion, 9/5/24, at 12. However, both CYF Caseworker and Father testified at the subsequent termination hearing that Father had biweekly video calls with the Children from July to November 2023. *See* N.T., 4/19/24, at 138-42, 153. CYF Caseworker's sole testimony about these visits — and indeed about Father's interactions with the Children — was that she observed one visit, "it went well," and Father "was appropriate." *Id*. at 143. As stated above, Dr. O'Hara specified that because he did not observe Father with the Children, he could not comment on Father's parenting, nor the effect, if any, termination would have on the Children. *See id*. at 93.

We acknowledge the trial court's thorough review of the evidence pertaining to subsection 2511(a)(2).[9] We also observe that Father does not dispute the trial court's repeated observations that, throughout the *majority* of CYF's long-time involvement with this family, he has not taken advantage of opportunities to visit the Children. Indeed, his prison video visits did not begin until 2023, more than ten years after CYF first became involved, and

---

[9] In light of our disposition under subsection 2511(b), we offer no opinion on the merits of CYF's petition as to subsection 2511(a)(2).

after CYF filed the underlying termination petitions.[10] Nevertheless, as summarized above, Father's **undisputed** testimony was that the recent video visits, in 2023, with the Children were "great," and they talked about school and the Children's activities and friends. *Id*. at 153-54. Father acknowledged that Drl.D. "was a little distant" and did not "really like the video visits," but he tried "to get her to come . . . out of her shell." *Id*. at 154-55. Father further testified that D.L.D. talked to him about her friends and school, and she wanted him to be in her life. *See id*. at 155. With regard to the younger children, Drv.D. and C.D., Father played "peekaboo" with them, and Drv.D. called his name "over and over." *Id*.

On this record, and under our jurisprudence recognizing the significant gravity of termination of parental rights, we determine CYF did not present clear and convincing evidence to establish the grounds for termination under subsection 2511(b). *See In re Adoption of C.M.*, 255 A.3d at 358; *see also Interest of K.T.*, 324 A.3d at 56; *In re M.P.*, 204 A.3d at 983. Here, CYF presented **no** evidence concerning the bonds between Father and each child, and whether termination of Father's parental rights would have any effect on

---

[10] As CYF sought termination of Father's rights under subsection 2511(a)(2) only, however, the trial court could consider his post-filing actions. **See** 23 Pa.C.S.A. § 2511(b) (providing that "[w]ith respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition").

each child's needs and best interests. Meanwhile, we reiterate, both CYF Caseworker and Father testified that his 2023 video visits went well.

In light of the foregoing, are constrained to vacate the trial court's termination orders. We remand these cases for the trial court to have an opportunity to hear evidence relevant to the subsection 2511(b) analysis, including whether bonds exist between Father and each of the Children, and the likely effects on the Children of permanently severing such bonds, and render a new decision.[11]

Orders vacated. Cases remanded for proceedings consistent with this memorandum. Jurisdiction relinquished.

Judge Bender joins this memorandum.

Judge Olson files a concurring and dissenting memorandum.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 3/27/2025

---

[11] As stated above, this panel affirms the trial court's order terminating Mother's parental rights as to C.D. In that appeal, we conclude that CYF met its evidentiary burden under both subsections 2511(a)(2) and (b). We note the sufficiency of evidence presented as to Mother was distinguishable from that relating to Father. In Mother's case, multiple CYF witnesses testified as to their observations of Mother's visits with C.D., as well as their bond; some of these witnesses also provided parenting coaching to Mother; Dr. O'Hara conducted interactional evaluations of Mother with C.D.; and Dr. O'Hara opined that termination would have a slight detrimental effect on C.D.